IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

OMNI USA, INC.,                    §
                                   §
            Plaintiff,             §
                                   §
VS.                                §   CIVIL ACTION H-10-4728
                                   §
PARKER-HANNIFIN CORPORATION,       §
                                   §
            Defendant.             §

**OPINION AND ORDER**

The above referenced action alleges that Defendant Parker-Hannifin Corporation ("Parker") improperly designed, manufactured, marketed, and serviced defective industrial oil seals sold to Plaintiff Omni USA, Inc. ("Omni") specifically for use in its gearboxes, sold as part of agricultural irrigation systems to a third party.  The Court's Opinion and Order of March 27, 2012 (instrument #26) dismissed with prejudice claims brought by Omni against Parker for fraud, fraudulent inducement, negligent misrepresentation, and violations of the Deceptive Trade Practices Act.  Omni's remaining claims against Parker are for breach of express warranties under § 2.313 of the Texas Business and Commerce Code, breach of implied warranties of merchantability and fitness for a particular purpose under §§ 2.314 and 2.315 of the Texas Business and Commerce Code, and breach of performance contract as defined under §§ 2.201(c), 2.204, and 2.206 of the Texas Business and Commerce Code.

-1-

Pending before the Court are the following motions:  (1) Parker's motion for partial summary judgment (#33) on Omni's remaining claims on the grounds that there is no defect or no evidence of any defect in Parker's seals; (2) Parker's second motion for summary judgment (#36) on all of Omni's claims; (3) Parker's motion for partial summary judgment against Omni on Parker's counterclaims[1] for unpaid invoices (#37); and (4) Parker's motion for spoliation instruction (#42).

After reviewing the briefs, the record and the applicable law, for the reasons stated below the Court concludes that Parker's three motions for partial summary judgment should be granted as indicated in this document.

Because  Omni's response to #37 refers the Court to its responses to Parker's motions for partial summary judgment as evidence (#47, p. 3) to support its affirmative defenses to Parker's counterclaims, the Court will first address Parker's two motions for partial summary judgment (#33 and 36).

## I.  Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions

---

[1] The controlling complaint is Omni's First Amended Original Complaint, instrument #16.  Parker's Answer to Omni's First Amended Complaint and Counterclaims is in instrument #22.

on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact and that the movant is entitled to summary judgment as a matter of law; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other

facts immaterial." *Celotex*, 477 U.S. at 323.   The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).   Conclusory allegations unsupported by evidence will not preclude summary judgment.   *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).   "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'"   *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986).   "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'"   *Id., quoting Liberty Lobby*, 477 U.S. at 252.   The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"   *Id.*, *quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th

Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.[2]

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

## II.  Relevant Substantive Law

Parker's motions for partial summary are grounded in several provisions of the Texas Business and Commerce Code.[3]

### *Breach of Contract*

Under the UCC, a breach of warranty, which is created when a seller makes an affirmation of fact or a promise to the purchaser that relates to the sale of a product and warrants a conformity to the affirmation or promise, is distinguishable from a breach of contract based on whether the buyer has finally accepted the

---

[2] The court has no obligation to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[3] Article 2 of the UCC relating to the sale of goods was adopted in Texas as Chapter 2 of the Business and Commerce Code. *Mehler Texnologies, Inc. v. Monolithic Constructors, Inc.*, Civ. A. No. 3:09-cv-0655-M, 2009 WL 3149383, *3 & n.17 (N.D. Tex. Sept. 29, 2009), *citing  Emerson Elec. Co. v. American Permanent Ware Co.*, 201 S.W. 3d 301, 310 (Tex. App.-Dallas 2006, no pet.).

goods[4]:  "[w]hen a party fails to deliver the goods as promised, a
breach  of  contract  occurs[,]  but  when  a  seller  delivers
nonconforming goods, it is a breach of warranty." *Structural
Metals, Inc. v. S&C Elec. Co.*, No. SA-09-CV-984-XR, 2012 WL 930816,
*3  (W.D.  Tex.  Mar.  19,  2012)(and  cases  cited  therein),  *citing
Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W. 2d 877, 890 (Tex.
App.--San Antonio 1996, writ denied); *in accord, Ellis v. Precision
Engine Rebuilders, Inc.*, 68 S.W. 3d 894, 897 (Tex. App.--Houston
[1st Dist.] 2002, no pet.); *Head v. U.S. Inspect DFW, Inc.*, 199 S.W.
3d  731,  746  (Tex.  App.--Fort  Worth  2005).   *See  generally
Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W. 2d 572, 576
(Tex. 1991)("The UCC recognizes that breach of contract and breach
of  warranty  are  not  the  same  cause  of  action.   The  remedies  for
breach  of  contract  are  set  forth  in  [Texas  Business  and  Commerce
Code]  section  2.711,  and  are  available  to  a  buyer  '[w]here  the
seller  fails  to  make  delivery.  .  .  .'   The  remedies  for  breach  of
warranty  are  set  forth  in  section  2.714,[5]  and  are  available  to  a

---

[4] *See Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W. 3d
830, 834 (Tex. App.--Dallas 2003, not pet.)(The "critical factor"
in determining whether a buyer has a claim for breach of contract
or a claim for breach of warranty is "whether the buyer has finally
accepted the goods"; "only after the buyer finally accepts the
goods and can no longer revoke that acceptance, is he limited to
recovering under section 2.714" for breach of warranty.).

[5] Section 2.714, "Buyer's Damages for Breach in Regard to
Accepted Goods," provides in relevant part,

    (a)  Where  the  buyer  has  accepted  goods  and  given
    notification  (Subsection  (c)  of  Section  2.607)  he  may

buyer who has finally accepted goods, but discovers the goods are defective in some manner.  Tex. Bus. & Com. Code Ann. § 2.714, § 2.711 (Comment 1)."

**Breach of Contract**

Section 2.204, "Formation in General," provides,

(a) A contract or sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(b) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(c) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

Section 2.206, "Offer and Acceptance in Formation of Contract," recites,

(a) Unless otherwise unambiguously indicated by the language or circumstances

(1) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the

---

recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(b) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

circumstances;

(2) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods, but such a shipment of non-conforming goods does not constitute an acceptance if the seller seasonally notifies the buyer that the shipment is offered only as an accommodation to the buyer.

(b) Where the beginning of a requested performance is a reasonable mode of acceptance an offeror who is not notified of acceptance within a reasonable time may treat the offer as having lapsed before acceptance.

To recover for breach of contract, a plaintiff must prove (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff; (3) breach by the defendant, and (4) harm to the plaintiff as a result of the breach. *Adams v. H&H Meat Prods., Inc.*, 41 S.W. 3d 762, 771 (Tex. App.--Corpus Christi 2001, no pet.).

Section 2.201 addresses "Formal Requirements; Statute of Frauds," and recites,

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.  A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(b) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient

-8-

against the sender is received and the party receiving it
has reason to know its contents, it satisfies the
requirements of Subsection (a) against such party unless
written notice of objection to its contents is given
within ten days after it is received.

(c) A contract which does not satisfy the requirements of
Subsection (a) but which is valid in other respects is
enforceable

> (1) if the goods are to be specially
> manufactured for the buyer and are not
> suitable for sale to others in the ordinary
> course of the seller's business and the
> seller, before notice of repudiation is
> received and under circumstances which
> reasonably indicate that the goods are for the
> buyer, has made either a substantial beginning
> of their manufacture or commitments for their
> procurement; or

> (2) if the party against whom enforcement is
> sought admits in his pleading, testimony or
> otherwise in court that a contract for sale
> was made, but the contract is not enforceable
> under this provision beyond the quantity of
> goods admitted; or

> (3) with respect to goods for which payment
> has been made and accepted or which have been
> received and accepted (§ 2.606).[6]

---

[6] Section 2.606 states,

(a) Acceptance of goods occurs when the buyer

> (1) after a reasonable opportunity to inspect
> the goods signifies to the seller that the
> goods are conforming or that he will take or
> retain them in spite of their non-conformity;
> or

> (2) fails to make an effective rejection
> (Subsection (a) of Section 2.602), but such
> acceptance does not occur until the buyer has
> had a reasonable opportunity to inspect them;
> or

Comment 2 to § 2.201 states, "Receipt and acceptance either of goods or of the price constitutes an unambiguous overt admission by both parties that a contract actually exists."

### *Breach of Express Warranties*

Section 2.313, titled "Express Warranties by Affirmation, Promise, Description, Sample," states,

(a) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(b) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

---

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful against the seller it is an acceptance only if ratified by him.

(b) Acceptance of a part of any commercial unit is acceptance of that entire unit.

The elements of a cause of action for breach of express warranty are (1) the defendant-seller made an express affirmation of fact or promise relating to the goods; (2) that affirmation or promise became part of the bargain; (3) the plaintiff relied upon that affirmation or promise; (4) the goods did not comply with the affirmation or promise; (5) the plaintiff was damaged by the noncompliance; and (6) the failure of the product to comply was the proximate cause of the plaintiff's injury. *Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 830 F. Supp. 2d 235, 255 (S.D. Tex. 2011), *superseded in part on other grounds*, 896 F. Supp. 2d 582 (S.D. Tex. 2012). To prevail on a breach of express warranty claim the plaintiff must demonstrate that he relied upon the warranty. *Am. Tobacco Co. v. Grinnell*, 951 S.W. 2d 420, 436 (Tex. 1997).

Section 2.725 applies to an action for breach of warranty for the sale of goods, whether implied or express. *See Safeway Stores, inc. v. Certainteed Corp.*, 710 S.W. 2d 544, 545-46 (Tex. 1986). The statute of limitations for breach of express warranty is four years, accruing from the date of delivery, regardless of whether the plaintiff lack knowledge of the breach, unless the warranty explicitly extends to future performance of the goods and discovery of the breach. § 2.725; *American Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W. 2d 173, 176 (Tex. App.-Houston [14th Dist.] 1984, no writ;.

Where an express warranty is shown to exist, it can only be

-11-

excluded or modified pursuant to § 2.316(a),[7] which requires that an exclusion or modification be "reasonable" and "consistent with the express warranties made.

---

[7] Section 2.316 ("Exclusion or Modification of Warranties") provides in relevant part,

(a) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (§ 2.202) negation or limitations is inoperative to the extent that such construction is unreasonable.

(b) Subject to Subsection (c), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(c) Notwithstanding Subsection (b),

(1) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(2) when the buyer before entering into the contract has examined the goods of the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(3) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade. . . .

**Breach of Implied Warranties**

An implied warranty is a representation about the implied quality or suitability of a product that the law implies and imports into a contract, "in view of all facts and circumstances attending the transaction, including the nature of the property, terms of the agreement, and trade usages." *American Tobacco*, 951 S.W. 2d at 435.

The statute of limitations for breach of implied warranty is four years after delivery of the goods to the original buyer. Tex. Bus. & Com. Code Ann. § 2.725(b)("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."). The statute of limitations for an implied warranty is not the same as that for an express warranty, which can be explicitly extended into the future by the parties. While the "statute of limitations on implied warranties runs from the date of the sale," the drafters of the UCC "intended to reserve the benefits of an extended warranty to those who bargained for them," so "only express warranties may explicitly extend to future performance." *Id.* at 546-48 (holding that "an implied warranty cannot be explicitly extended to future performance"). *In accord American Alloy Steel, Inc. v. Armco, Inc.*, 777 S.W. 2d 173, 176-77 (Tex. App.--Houston [14th Dist.] Aug. 24, 1989); *Pecan Valley Nut Co., Inc. v. E.I. du Pont de Nemours & Co.*, 15 S.W. 3d 244, 249 (Tex. App.--Eastland Mar. 9, 2000); *Cornerstones Mun. Utility Dist.*

*v. Monsanto Co.*, 889 S.W. 2d 570, 577 (Tex. App.--Houston [1st Dist.] 1994, writ denied).

Section 2.314, "Implied Warranty:  Merchantability; Usage of Trade," provides in relevant part,

> (a) Unless excluded or modified (§ 2.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> (b) Goods to be merchantable must be at least such as
>
> > (1) pass without objection in the trade under the contract description; and
> >
> > (2) in the case of fungible goods, are of fair average quality within the description; and
> >
> > (3) are fit for the ordinary purposes for which such goods are used; and
> >
> > (4) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
> >
> > (5) are adequately contained, packaged, and labeled as the agreement may require; and
> >
> > (6) conform to the promises or affirmations of fact made on the container or label, if any.
>
> (c) Unless excluded or modified (§ 2.316) other implied warranties may arise from course of dealing or usage of trade.

To prevail on an action for breach of implied warranty of merchantability, a plaintiff must prove (1) that the merchant sold goods to the plaintiff; (2) that the goods were unmerchantable, that is, unfit for ordinary purposes; (3) that the plaintiff notified the defendant of the breach; and (4) that the plaintiff

suffered injury. *Hartford v. Lyndon-DFS Warranty Services, Inc.*, 2010 WL 2220443, *11 (Tex. App.--Houston [1st Dist.] May 28, 2010)(citing *inter alia* 2.314 cmt. 3, and *Hyundai Motor Co. v. Rodriguez*, 995 S.W. 2d 661, 667-68 (Tex. 1999). Proof of a defect is required for a claim of breach of implied warranty of merchantability under § 2.314. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W. 2d 442, 443 (Tex. 1989). The "defect" in an implied warranty case "means condition of the goods that renders them unfit for the ordinary purposes for which they are used because of lack of something necessary for adequacy" at the time they left the manufacturer's or seller's possession. *Plas-Tex*, 772 S.W. 2d at 444.

The defendant may assert a defense of disclaimer under the UCC, Tex. Bus. & Com. Code Ann. 2.316(b), to a claim of implied warranty of merchantability as well as an implied warranty of fitness for a particular purpose. *Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W. 2d 572, 577 (Tex. 1991); *Plas-Tex*, 772 S.W. 2d at 444. *Id*. The disclaimer must be conspicuous and include the word, "merchantability." *Plas-Tex*, 772 S.W. 2d at 444. Whether the disclaimer is conspicuous is a question of law for the court. *Id., citing* Tex. Bus. & Com. Code Ann. § 1.201(b)(10). A term is conspicuous if a reasonable person against whom it is to operate would have noticed it. *Id.*; *Cate v. Dover Corp.*, 790 S.W. 2d 559, 561 (Tex. 1990). Print in a text is conspicuous if it is set off

from the surrounding words by symbols, marks that draw attention to it, or larger or contrasting type, font or color. *Id; id.* Even if the warranty is inconspicuous, the disclaimer is valid if the buyer has actual knowledge of the disclaimer. *Cate v. Dover Corp.*, 790 S.W. 2d at 561 ("Because the object of the conspicuousness requirement is to protect the buyer from surprise and an unknowing waiver of his or her rights, inconspicuous language is immaterial when the buyer has actual knowledge of the disclaimer."). The seller bears the burden of proving that the buyer had actual knowledge of an inconspicuous disclaimer of implied warranties. *Id.* The seller can show actual knowledge by its prior dealings with the seller or by the showing that it called the buyer's attention to the inconspicuous waiver. *Id.* A written disclaimer is not required; an oral disclaimer may be effective, provided that for the implied warranty of merchantability, the word "merchantability" is used. *Id.* and n.4, citing J. White & R. Summers, *Uniform Commercial Code* § 12-5 n.76 (2d ed. 1980).

To prove a breach of the implied warranty of merchantability, a plaintiff must demonstrate a defect in the "condition of the goods that renders them unfit for the ordinary purposes for which they are used" under § 2.314(b)(3). *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W. 2d 442, 443-44 (Tex. 1989). The plaintiff, who bears the burden of showing that the goods were defective at the time they left the manufacturer's or seller's possession, may use

circumstantial evidence to show the goods had a defect; he does not need to use direct or expert evidence.  *Id.* at 444; *in accord, Hyundai Motor Co. v. Rodriguez*, 995 S.W. 2d 661, 667-68 (Tex. 1999).

Section 2.315, "Implied Warranty:  Fitness for Particular Purpose," asserts,

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

"A 'particular purpose' is a specific use by the buyer that is peculiar to the nature of the buyer's business.  A particular purpose differs from an ordinary purpose, which is the purpose envisaged in the concept of merchantability and goes to the uses that are customarily made of the goods."  *Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 830 F. Supp. 2d 235, 252 (S.D. Tex. 2011)(*citing* § 2.315 cmt. 2), *superseded in part on other grounds*, 896 F. Supp. 2d 582 (S.D. Tex. 2012).

An implied warranty of fitness may also be disclaimed, but the disclaimer may be by general language and need not use the word, "fitness."  *Hartford*,  2010 WL 2220443, *11.  An implied warranty may only be excluded or modified pursuant to § 2.316(b), which requires that the exclusion or modification be in writing and be conspicuous.  *Cate v. Cover*, 790 S.W. 2d 559, 560-61 (Tex. 1990).

To prevail on a claim for breach of implied warranty of fitness for a particular purpose, the plaintiff must prove that (1) the seller had reason to know any particular purpose for which the goods were required at the time of contracting; (2) the buyer actually and justifiably relied on the seller's skill or judgment to select or furnish suitable goods; (3) the plaintiff notified defendant of the breach within a reasonable time after the buyer discovered or should have discovered any breach of warranty or he is "barred of remedy"4 pursuant to § 2607(c)(1) (4) the plaintiff suffered injury; and (5) the defendant's breach caused the plaintiff's injury.[8] *Berge Helene*, 830 F. Supp. 2d at 252-53.

## III. Allegations of Plaintiff's
## First Amended Original Complaint (#16)

Plaintiff's First Amended Original Complaint was filed pursuant to a Court order (#15) after the Court granted Parker's motion for more definite statement.  In the amended pleading Omni alleges that in 2004 Omni met several times with Parker's Houston sales representative, Ronnie Lovett ("Lovett"), in Omni's Houston office. So did Paul Yager ("Yager"), Parker's Rotary Seals Market Manager for Parker's PS Division.  Lovett verbally represented to

---

[8] "Caused in fact" means that the defendant's conduct or product was a "substantial factor in bringing about the injury which would not otherwise have occurred." *Berge Helene*, 830 F. Supp. 2d at 254.  To recover consequential or special damages the plaintiff must also show the breach proximately caused the plaintiff's injuries, i.e. both cause in fact and foreseeability. *Id.*

Omni that Parker would be fully capable of designing and manufacturing high quality cartridge seals for Omni's gearboxes, which Omni would then sell to T-L Irrigation Company ("T&L") for use in T&L's agricultural irrigation systems.  Based on this representation, Omni agreed to have Parker design and manufacture the seals.  The parties also agreed that Parker ultimately would have final design control over the design and manufacture of the seals.

Before this agreement was made, Parker had represented to Omni that Parker had finished an analysis of Omni's gearbox design and compared it to seal designs of other seal suppliers in the agricultural irrigation market.  Through Lovett and Yager, Parker represented that it could design and manufacture a cartridge seal for Omni's gearbox that would allow Omni's gearbox to operate and function successfully in an agricultural irrigation system.  According to the amended pleading, when these representations were made, Parker did not actually possess the necessary knowledge, skills, technology, or other capabilities or resources that Parker claimed, and Parker was not sure that it could design and manufacture the functional cartridge seal design requested by Omni within the time frame established by Omni.

According to the Amended Complaint, from 2005-07 Parker began supplying Plaintiff with the seals, which Omni installed in its gearboxes and forwarded to T&L.  According to Omni, it only later

discovered that the seals were defective at the time that they were delivered to Omni. During this time, Omni made several payments to Parker, and Parker sent several invoices to Omni. On the back side of some of these invoices was inconspicuous language that was not referenced in the invoices and that was not noticed when the invoices were received by Omni. All invoices that Omni received from Parker were received after the first shipment of seals; there was no course of dealings between Omni and Parker whereby the additional terms on the reverse side of the invoices became part of the agreement.

T&L subsequently sold the agricultural systems containing the gearboxes and seals to end-users. At some point after 2007, T&L notified Omni that at least some of the gearboxes were leaking oil in the field (the "leakage") because of a problem in the design and/or manufacturing process of the seals. Omni promptly notified Parker and suspended payment to Parker until the defective design issue could be resolved. Omni allowed Parker to come to its Houston offices to obtain samples of the defective seals and gearboxes for testing. Subsequently and more than once, Parker admitted there were failures in the seal design and in the quality control aspects of Parker's manufacturing processes.

Nevertheless Parker has disclaimed responsibility for the seal design and/or manufacturing and blamed faulty design failures on Omni, which is not and does not claim to be a designer or

manufacturer of seals.  In contrast, Parker represents itself to be the "world's leading diversified manufacturer of motion and control technologies and systems, providing precision-engineered solutions for a wide variety of mobile, industrial and aerospace markets." Ex. A.  Omni asserts that Parker changed its materials supplier(s) during the production of the seals and that Parker chose and used inferior materials that directly caused the leakage.  Parker also allegedly changed the seal's "rib" design during production, evidencing Parker's own testing of and attempts to correct the design problems.

Omni and T&L continued to report incidents of leakage to Parker, which later indicated that it found certain defects in the design and proposed to correct the deficiencies, but in return it required Plaintiff to agree to make future seal purchases from Parker at a much higher price per seal.

In sum, Omni contends that Parker's seal manufacturing and related services were defective in design, workmanship, manufacture, production, marketing, testing, and investigation of corrective design.

## IV.  Parker's [First] Motion for Partial Summary Judgment (#33)

Parker contends that Omni's entire case rests on whether the Parker seals in dispute were defective.  Parker argues that the summary judgment evidence establishes that the seals were not defective and that Omni cannot produce any summary judgment

evidence of a defect in Parker's seals which caused the leaks complained of by T&L. Therefore Parker is entitled to summary judgment on Omni's claims as a matter of law.

The Court observes that there is disagreement about which party is responsible for the design of the seals at issue. Parker asserts that in early 2004 Omni came to Parker and asked for a quotation for a "cartridge" seal that could be used in Omni's agricultural gearboxes. Ex. B, Feb. 21, 2012 Dep. of Jeff Daniel ("Daniel"), President of Omni, at pp. 114-20.[9] Parker sent Omni a quotation (Ex. C) on May 21, 2004. Parker maintains that it made a substantially identical drawing of the sample provided by Omni, and that Omni then approved the drawing. Ex. D June 24, 2013, Oct. 23, 2012 Dep. of Omni's Technical Support Manager and designated corporate representative, David Kemper ("Kemper"), who on behalf of Omni approved the drawings as fitting the space in the Omni gearbox, pp. 34-37. Kemper further testified that he understood that testing to insure that the seal worked with the gearbox was being done by Parker and that the seals had been used for a few

---

[9] Daniel explained that T&L had been using a lip seal but that the market was changing over to using "cartridge" (a/k/a "cassette") seals, which Daniel testified were better seals for keeping the oil in the gearbox and sealed for a longer term. *Id*.
    Daniel also stated, p. 118, ll. 20-25, "I asked them [Parker] to look at a variety of different cassette-type seals. I gave them not only samples, but leaflets, drawings that were not design drawings, but they were technical sketches of a cross-section of a product, and asked them to supply us a seal that would do the job that was required in the irrigation market."

years with no complaints.  *Id.* at p. 36.

Omni's designated corporate representatives, Kemper and Operations Manager Daniel Lloyd Matthews ("Matthews"), both testified that it was Omni's responsibility to install the seals and ensure that they were installed correctly, and to insure that they were tested and would not be shipped to the customer until they passed.  Ex. D, at 28-30; Ex. E, Matthews Dep. at pp. 75-76 and Ex. 2.  Both men confirmed that the Parker seals were capable of being properly installed.  Ex. D at pp. 29-33 and Ex. 2; Ex. E at pp. 75-76 and Ex. 2).  Furthermore Kemper stated that every gearbox was tested for leaks[10] and had to pass the inspection before it left Omni's manufacturing sites.  Ex. D at pp. 17-18, 29-30.

The first complaints of leakage in the area of the seals inside the gearboxes that were sold and shipped in 2005 by Omni to T&L came in the fall of 2007 from T&L.  Kemper Dep. Ex. D at pp. 31-33 & Ex. 9; Matthews Dep., Ex. E at pp. 116-20 and Ex. 9.  No "root cause analysis" was performed to determine the cause of the reported leakage.  Ex. B, Daniel Dep. at 207-14; Ex. E, Matthews Dep. at pp. 113-15.  What testing was done did not reveal leaking

---

[10] Kemper stated the assembler would check to see if the seal was correctly placed in the gearbox and not cocked to a visible degree, while the quality control process would pressurize the gearboxes with air, usually 10-12 psi, place them in tanks of water and  see if bubbles emerged.  All of the gear boxes had to pass the leak test before they left Omni's manufacturing facilities.  #33, Ex. 3, pp. 17-18, 28.  If they did not pass the test, they would be rejected, reworked, and not go to the customer until they passed the test.  *Id.* at 28-29.

or determine what caused the leakage.  Ex. B at 207-24; Ex. E at
pp. 122-24 & Ex. 10.  Nor was there any evidence of a defect in any
Parker seal.   At his deposition on October 23, 2012 Kemper
testified that he was not aware of any defects with the Parker or
the J.M. Clipper[11] seals (supplied by Parker).   Ex. D at p. 30.
Matthews testified at his deposition on the same date that he also
did not know of any defect in the Parker seals.  Ex. E at pp. 116-
21, 125-26 & Ex. 9.  Parker maintains that the evidence that exists
shows only that improper installation of the seals by Omni may have
been the cause of the leakage.

Nor did Omni's expert, mechanical engineer Merle Lynn Bell
("Bell")[12], identify a defect when he tested the Parker seal by
comparing a gearbox with seven-year-old Parker seals to a gearbox
with new seals from Omni's current supplier.   The Parker-seal
gearbox began to leak after running for approximately three hours.
Ex. F, Bell Dep., p. 48.  Bell took the gearbox apart and noticed
that the seal was cocked (misaligned) .044 inches, i.e., not seated
flush in its seat in the gearbox.  *Id.* at p. 51.  Bell did not
determine the source of the leaking, but only that it might have

---

[11] J.M. Clipper was the company that was originally approached
by Omni and sold the seals in dispute to Omni, but it was later
acquired by Parker.   It is sometimes referred to as "JMC", JM
Clipper, or "Clipper" by the parties or witnesses. The parties
frequently use "Parker" for J.M. Clipper.  *See, e.g.,* #33, p.3,
n.1.

[12] Bell is usually referred to by the parties as Mark Bell.

been coming from any of several locations. *Id.* at 52. Bell's expert report (Ex. K) and deposition (Ex. F) reflect that his tests merely revealed the possibility of what might cause leakage, not a probability or conclusion. Bell testified that the cause of the leakage was not any alleged change by Parker in the design of the seal from three higher ridges to four smaller ridges. Ex. F. pp. 98-99. Bell agreed that his testing did not rule out key possible causes of leakage, such as the age of the seal, improper installation of the seal by Omni, or out-of specification conditions of the gear box. Ex. F, p. 106.[13]

Thus neither Omni's designated corporate representatives nor its expert identified a defect in the Parker seals. For Omni to prevail on its breach of contract claim it must prove that Parker breached a contract and caused Omni's injury; specifically it must prove that its injury was a natural, probable and foreseeable consequence of Parker's breach. *Mead v. Johnson Group*, 615 S.W. 2d 685, 687 (Tex. 1981).

To prevail on its claim of breach of express warranties "with respect to the seals sold to Plaintiff by selling same in a defective condition likely to cause leakage and product malfunction that did occur," Omni must establish that the seals did not comply

---

[13] Parker's expert witness, Timothy Hatch, concluded that improper installation of seals by Omni, evidenced by their cocked or tilted positions, caused Parker's seals to leak. Ex. H, Hatch's Dep. at pp. 99-100 and 61-63; Ex. G, Hatch's Decl. and report at pp. 5-6.

with Parker's alleged representation regarding "the character, quality or title promised at the time of sale." *Chilton Ins. Co. v. Pate & Pate Enters.,* 930 S.W. 2d 877, 891 (Tex. App.--San Antonio 1996, writ denied).

Nither party disputes that Parker knew from the start of the parties' negotiations the particular purpose for which the seals were to be used: the cartridge seals Parker was to manufacture were to be inserted into and perform as components of Omni's gearboxes to allow Omni's gearboxes to operate and function successfully in an agricultural irrigation system to be sold to other parties. Omni charges that Parker breached implied warranties of merchantability and fitness for a particular purpose "by selling such seals to Plaintiff in a defective condition likely to cause the leakage and product malfunction that did occur." First Amended Complaint at ¶ 24.

According to Parker, all of Omni's claims require it to prove there is a defect in Parker's seals. Neither Omni's corporate representatives nor its expert could identify a defect in Parker's seals that caused the leakage. Because Omni cannot do so, Parker insists that it is entitled to summary judgment on those claims.

## A. Omni's Response (#39)

Omni objects that there are genuine issues of material fact on each element of its claims for breach of express warranties and of implied warranties, as well as for breach of contract. Parker's

contention that the leakage was caused by Omni's improper installation of the seals is contradicted by evidence that the Parker seals were defective in (1) the accelerated functional test of gearbox rotary seal and associated report dated September 6, 2012 (Ex. C, comparing JMC seal with one from current competitor and concluding that the JMC seal was the primary cause of leakage); (2) the seal installation verification and repeatability of rotary gearbox and associated report dated October 15, 2012 (Ex. D, concluding that in contrast with the seals of the current competitor, all JMC seals will have a certain degree of misalignment during the installation process," that all of the ten identical seals tested "were angled (misaligned) more than the allowable standards for this type of seal," and that the seals' misalignment could be the primary cause of the seals' leakage"); and (3) the seal rotation test of rotary gearbox seal and associated report dated December 12, 2012 (Ex. E, finding that although the seals are designed to be static on the ID of the seal and the OD of the shaft, of the ten identical seals examined a percentage were not static on the shaft OD and thus inconsistent with a properly designed seal).[14] Omni maintains that this evidence demonstrates that the seals were defective because they failed prematurely because of either the improper operation of the seal

---

[14] These tests were performed and the reports prepared by Bell and his company, Essential Product Services, Inc. ("EPS").

design or from the misalignment inherent in that design that made it impossible to install the seals correctly.

As summary judgment evidence, Omni submits the following for the reasons stated.   First, excerpts of Parker's responses to Omni's first set of interrogatories (Ex. A, p.6, ll. 5-6, "[Lovett and Yager] will testify that the seals it sold to Omni were manufactured pursuant to a design requested and approved by Omni.") are attached to show that Parker is trying to shift the responsibility of design control to Omni even though Parker admitted it developed and proposed the subject designs (Ex. A, p.9, ll. 2-4, "Mr. Daniels [*sic*] required that the seals be manufactured in China.   After J.M. Clipper determined that it could outsource a cartridge seal with a similar type of design from a low-cost country to meet Omni's cost requirement, as requested by Omni, and it submitted the proposed design to Omni, Omni reviewed and approved it.").   Second, Omni presents excerpts from the deposition (Ex. B) of Parker's expert, Timothy Brian Hatch, to show that (a) Parker's attempt to shift the responsibility of design control to Omni failed, while admitting that Parker developed and proposed the subject designs[15]; (b) Parker's expert, Hatch, did not try to test

---

[15] The Court observes that Hatch's testimony is equivocal (Ex. B at p. 81, l. 22-p. 82, l.6):

Q.  Do you know whether Parker designed the seals?
A.  Yes.
Q.  So you think they designed the seals in this case?
A.  I believe the basic design was given to Parker from

any of the possible ways offered in his expert report that the seals could have been improperly installed and admitted that the "improper installation" mentioned in his report was a conclusory opinion based solely on a results-oriented visual examination and not on any actual knowledge of Omni's installation procedures (*id.* at p. 99, l.1-p. 103, l.17)[16]; (c) Parker's expert did not attempt to test for any other potential cause (operator error, improper maintenance, manufacturing error, or defective design) of the leakage (Ex. B, p. 107, l. 18-p. 113, l. 18)[17]; and (d) Hatch

---

      Omni.  I'm not sure how much additional design was required for them to manufacture it.
Q.  Who finalized the design?
A.  I'm sure it was Parker, but I don't know that.  Yeah, Parker, that's what they do is they design seals.


[16] Hatch stated, "I haven't seen how they actually install it at the factory, but, you know, some of these are cocked to such a degree, you can see it with the naked eye that it was crooked, so it would be obvious to tell that it wasn't installed right."  Ex. B at p. 99, ll. 18-23.

[17] The Court notes that when asked if any of the potential possible causes raised during his deposition was "inherently more important than the other potential causes?," Hatch responded,

A.  Yes.  You have to make sure that you start with a good design first.  If the seal is going to leak even if it is installed properly, then its going to leak if it's installed properly.
Q.  Okay.  Well--
A.  These, as I . . . you know, they had a large number of them that did not leak, and - -
Q.  But as far as - -
A.  - - if the design is the same, then that proves that the design isn't the issue or indicates that the design isn't the issue.

admitted that if Parker's seals were designed so that it was impossible to install them correctly, Hatch would conclude that the seals were defectively designed[18] (Ex. B, p. 121, ll. 11-16).[19]

Next, to establish that Parker's seals were defective and/or defectively designed, Omni points to EPS's expert tests and reports of EPS, Bell's company (Exhibit C, functional test and report, p.4; Ex. D, seal installation test and verification and repeatability of rotary gearbox and associated report dated October 15, 2012; and Ex. E, seal rotation test and report), which Omni claims establish that the seals were defective as evidenced by premature failure from either improper operation of the seal design or from the misalignment failure inherent in the seals' design, making correct installation impossible.

Regarding the first, Exhibit C at pp. 4-5, Omni quotes a portion of the "SUMMARY OF OPINIONS":

> Based on the analysis and tests conducted, EPS[20] has concluded that oil leakage originated almost immediately from the JMC seal, while the seal from the current

---

Ex. B at p. 113, ll. 13-25.

[18] The Court agrees with Parker (#43 at p.4) that this hypothetical lacks foundation, is not relevant, and does not constitute competent proof that Parker's seals were designed to make proper installation impossible. As Parker and its expert point out, not all the gearboxes leaked.

[19] Regarding (b) and (c), Omni appears to ignore the fact that it bears the burden of proving that Parker's seal was defective.

[20] EPS is Essential Product Services, Inc., which performed the test, and is an expert witness for Omni.

supplier did not exhibit any leakage. Leakage
originating from the JMC seal was excessive and would
cause failure of the gearbox. Leakage from the JMC seal
originated between the shaft and the seal, which supports
EPS's[21] opinion that the seal was the primary cause of
the leakage.[22]

This report at p. 6 also found that Parkers' seals had two
different designs despite having the same part number, and it
stated at p. 7, "It is the opinion of EPS that making changes
without customer approval to a seal design after it has been
successfully tested and qualified is not considered acceptable."[23]
EPS represents that because the first test "obviously raised the
question of why was the seal improperly aligned and could this be
the mode of failure in the field" (Ex. C at p. 7), a second test
was conducted to determine if Defendant's seals were capable of
being properly installed. Exs. D & E. According to the second
test results, all of Parker's seals were misaligned outside the
allowable tolerance, while seals from Omni's current supplier had
almost no misalignment. Ex. C at pp. 6-7. EPS concluded that
Parker's seals could not be installed within industry standards and

---

[21] The Court notes that the report continues, "[F]urther tests
are now needed to confirm whether the design of JMC component parts
were defective with regard to feasibility of installation. [*sic*]"
Thus their original findings were not final.

[22] Omni omits a subsequent key sentence in that paragraph:
"However, further tests are now needed to confirm whether the
design of JMC component parts were defective with regard to
feasibility of installation."

[23] The Court observes that EPS does not provide any foundation
or reason for this conclusion.

that this factor was the most likely cause of failures in the field.  Ex. C, p. 7, and Ex. E, p. 8.  A third test was performed to determine if Parker's seals could operate as designed (Ex. E); EPS concluded that Parker's "seals are inconsistent when it comes to what parts of the seal are static and what parts are dynamic. While the [current] supplier's seals rotate consistently and as designed, many of [Parker's] seals tested rotated on the shaft instead of within the seal itself."  Ex. E, pp. 3, 8.  Furthermore the "Overall Summary" of the third report (Ex. E at p. 9) concluded following the three tests,

> Based on the testing completed, it is clear that these seals are designed with too much internal friction and torque to the point that many of them do not operate correctly.  In addition, the rubber coating on this particular seal design is such that it makes them very difficult if not impossible to consistently install correctly.

> Therefore, it is my opinion that these seals are experiencing premature failure from either improper operation of the seal itself, or from the misalignment problems inherent to this design.

Insisting that "[t]hese reports, individually and collectively, establish that the subject seals **were defective** because the seals underwent premature failure caused by improper operation of the seal design itself (unable to rotate consistently) and/or from the misalignment failure inherent to Defendant's design (unable to be properly installed")(Ex. E at pp. 9-10), Omni insists that Parker is liable for breach of express warranties because its seals did not comply with its representations that it would be able to design

an operable and functional cartridge seal for Omni's gearbox, for breach of implied warranties because Parker's seals were unmerchantable, and (c) for breach of its contract to provide Omni with non-defective seals.

## B. Parker's Reply (#43)

Parker objects that Omni still has not identified a defect in the material or workmanship of the Parker seals, no less showed that one caused any leakage. Nor has it demonstrated that the Parker component part (the seal) in the Omni gearboxes was defective on the date of delivery in 2005, but only that some gearboxes two years later leaked.

Parker complains that the expert reports attached to Omni's response are not sworn. "'Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment.'" *Provident Life and Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001), *quoting* 11 James Wm. Moore, *et al., Moore's Federal Practice* ¶ 60.42[6] (3d ed. 1997).[24] Parker further objects to the deposition excerpts because there is no court reporter certificate and no title page or other evidence showing who the witness is or that the witness was sworn.

---

[24] Because United States Magistrate Judge Frances Stacy denied Parker's motion to strike and exclude expert evidence (#33, 58) the Court does not address the other arguments Parker raised for striking the reports.

*Refrigeracion y Restaurante S.A. De C.V. v. Wal-Mart Stores, Inc.*,
No. Civ. A. SA97CA354EP, 1998 WL 1782541, at *1 (W.D. Tex. July 21,
1998)("Excerpts from depositions are not competent summary judgment
evidence unless the party offering them attaches a copy of the
court reporter's certificate certifying that the copy is true and
correct."), *aff'd*, ____ Fed. Appx. ____, 189 F.3d 469 (Table), No.
98-50844, 1999 WL 548666 (5th Cir. July 13, 1999).  Moreover, even
if the Court considers this evidence, Parker is still entitled to
summary judgment.

        Regarding Parker's discovery responses which purportedly show
that it is responsible for a defect in the seals because it
participated in the design of the seal, Parker argues that the
evidence shows that Omni engineers approved the design, dimension,
and materials of the seals, that Parker made a substantially
identical drawing of the sample provided by Omni, and that Omni
approved it and emailed the signed approval of the seals on August
27, 2004 stating that Omni was ready to place the purchase order.
Omni's signature on the drawings shows that it found the seal
dimension, design, and material to be satisfactory.  Furthermore,
after signing the drawings, Omni tested the seals for fit and
installation by installing samples and performing pressure tests.
Regardless of who had design control, Omni has failed to identify
a defect in the seals that caused the Omni-built gearboxes to leak.

        Parker contends that its expert Hatch's deposition supports

Parker's position because Hatch opined that any seals that leaked did so not because of a defect in the component seal, but because they were improperly installed by Omni.  Ex. B at p. 99 to Omni's response.  Omni's claim that Hatch never performed any tests is meritless because Hatch's opinion was expressly based on tests that Omni performed, discovery answers that Omni gave, and the Omni e-mails in this case.  Omni's technical expert, Mark Bell, agreed in his deposition.

Parker insists that the evidence shows that the seals were capable of being installed correctly and were, by the thousands. If some were not installed properly, it was Omni's duty to ensure that they were installed correctly (as evidenced by the testimony of Omni's designated corporate representatives Matthews and Kemper, that every gearbox was supposed to have been tested before leaving Omni's manufacturing sites, that no complaints were made for years, and that thousands of gearboxes did not leak), or to notice they were not installed properly and to correct its installation technique at the factory or its gearbox design or to give notice of the problem to Parker, none of which it did.  Bell's subsequent reports of October 15 and December 12, 2012 still do not identify a defect in the seals or their design nor even a probability that they could cause the leakage.  Nor does Bell rule out other factors such as the age of the seals tested, the changes Omni made in its gearboxes without Parker's knowledge, or Omni's duty to install the

-35-

seals and ensure they were properly installed.  Parker argues that Bell's summary that the "seals are experiencing premature failure from either improper operation of the seal itself or from the misalignment problems inherent to this design" is not an opinion that there is a defect in the seals that caused any seal to leak, much less any gearbox to leak, and even if it were, it would be conclusory and contrary to Bell's sworn deposition testimony. Moreover Omni admittedly used thousands of seals from a different supplier in gearboxes sold to T&L so Omni cannot prove causation.

In a supplement (#58), Parker emphasizes that it did not install the seals and had no control over seal installation. Because Omni had complete control in the design of the gearboxes into which the seals were installed, complete control over the installation process, complete control of the installation technique, and complete control over checking the boxes (i.e., quality control), it would be Omni's duty to discover a defect, give notice, and either reject the goods (the seals) or change its own design.  It did neither.  Thus Parker claims it is entitled to summary judgment.

In a second supplement to its motions for partial summary judgment(#62), however, relating to Bell's second court-ordered deposition on February 26, 2013 (Transcript, Ex. A, attached), pointing out that Bell did not know before performing his experiments that the Parker seals he was inspecting were six or

seven years old while the comparison seals were new, Parker highlights Bell's admissions that (1) his first test and report, aimed at proving Parker seals were inferior to other designs, did not contain valid conclusions and that he could not state that Parker seals were inferior; (2) he has no opinion of how Parker seals performed when new because he only tested old ones, had no opinion about other causes of difficult installation because he was not asked by Omni to investigate Omni's inspection practices, installation techniques, consistency of gearbox dimensions, manufacturing practices, worker training, or quality control, and admitted that difficult installation of a seal into a company's gearbox is not proof of a defect in the seal; and (3) regarding the third test and report, performed to see if the Parker seals would rotate, again he had no opinion as to how the Parker seals behaved when new because he only tested old ones. Bell further testified that as the manufacturer of the end product, Omni had the responsibility to determine that the seals fit into the gear box and worked, that all the component parts are proper for the end product, and that difficulty in installing a seal does not indicate there is a defect in the seal's design. He admitted that he was not given the information necessary to find out why the Omni gearboxes sent to T&L were leaking, whether there was a flaw in the endcaps of the gearboxes, whether the manner of assembly or manufacture was faulty, or whether there was a problem with the

quality control of the gearboxes, all within Omni's control.

In sum, Parker repeats that Bell cannot identify the cause of Omni's gearbox leakage and that Omni was responsible for noticing if the seals were not being installed correctly and to correct the problem or give notice of the problem and reject the seals.

Moreover, one element of a breach of warranty claim not demonstrated by Omni here is that the plaintiff must provide notice to the defendant of the breach under § 2.607(c)(1)("Where a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . ."). *See U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W. 3d 194, 200 (Tex. App.-- Houston [1st Dist.] 2003, pet. denied).  Because Omni failed to provide such notice, it cannot recover for breach of warranty.

Omni has not responded to the First or Second Supplement.

## V.  Parker's Second Motion for Partial Summary Judgment (#36)

Incorporating #33, Parker's second motion notes that all the seals Parker sold to Omni were subject to the quotation dated May 21, 2004 that Parker sent as an offer for an agreement to provide the seals to Omni.  After the first sentence stating, "This quotation is made subject to placement and of your order(s) by 60 days," it provides in enlarged capital letters that set it of from the remainder of the text, "WE INVITE YOUR ATTENTION TO THE TERMS AND CONDITIONS OF SALE WHICH APPEAR ON THE REVERSE SIDE OF THIS

QUOTATION AND WHICH ARE A PART OF THIS QUOTATION." Ex. B and C (reverse side)[25] to #36. The "TERMS AND CONDITIONS" constitute an express warranty.  Included among the "TERMS AND CONDITIONS," all in bold print, are the following, with lower case and capital letters rendered as they are in the document:

> 6. Warranty.  All shipments of the product sold hereby are subject to the following warranty:  THE SELLER WARRANTS FOR A PERIOD OF ONE YEAR FROM THE DATE OF DELIVERY THAT THE PRODUCT IS FREE FROM DEFECTS IN MATERIALS AND WORKMANSHIP.  THIS LIMITED WARRANTY IS YOUR EXCLUSIVE WARRANTY FROM THE SELLER AND DESCRIBES THE EXCLUSIVE REMEDY AVAILABLE TO ANY PURCHASER OF THE PRODUCT.  THE PRODUCT IS NOT SOLD WITH ANY IMPLIED WARRANTIES.  NOR ANY WARRANTY OF MERCHANTABILITY AND/OR OTHER WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.  IN THE SALE OF THE PRODUCT SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND OTHER THAN THAT STATED HEREIN AND NO PERSON IS AUTHORIZED TO ALTER THIS WARRANTY ORALLY.

#36, Ex. B and C.  Another term and condition is the following:

> 7. Limitations of Liability.  It is expressly understood and agreed that the limit of Seller's liability shall be, at Seller's sole option, repair or resupply of the product.  Resupply shall mean furnishing free of charge (F.O.B. place of original purchase) a new shipment of the product (uninstalled) in an amount sufficient to replace any product found to be defective.  All labor and service charges which may be incurred with respect to either the original or replacement product are excluded. THE SELLER SHALL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES SUCH AS DAMAGE TO ANY BUILDING STRUCTURES TO WHICH THE PRODUCT IS AFFIXED OR ITS CONTENTS; NOR SHALL THE SELLER BE LIABLE FOR ANY DAMAGES WHICH ARE BASED UPON ALLEGED NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY OR ANY OTHER THEORY OTHER THAN THE LIMITED LIABILITY SET FORTH ABOVE.  INCIDENTAL AND CONSEQUENTIAL

---

[25] Parker states that Ex. C is the best copy of the quotation that the parties have, but the wording has been reduced through the copying process.  Ex. B is more legible and closer to the original size of the document.

> DAMAGES SHALL NOT BE RECOVERABLE EVEN IF THE RESUPPLY
> FAILS OF ITS PURPOSE OR FOR ANY OTHER REASON.

Also contained in the "TERMS AND CONDITIONS" is the requirement, "8.  Any claim on account of damaged products, warranty, short count or for any other cause shall be deemed waived unless made in writing within 30 days from the date the defect or cause to which each claim relates is discovered or should have been discovered." Exs. B and C.

After Omni accepted the "TERMS AND CONDITONS", Parker sent a "final pricing" quotation on July 16, 2004 that included on the front page another condition:  "[Parker] is not able to provide a service life for your specific application at this time.  Any warranty claims associated with service life of product is not the responsibility of [Parker.]"  #36, Ex. D., Final Pricing, signed by Paul Yager.

After approving Parker's substantially identical drawing of a sample provided by Omni, Omni emailed the signed approval of the seals on August 27, 2004, stating that Omni was ready to place the purchase order.  Exs. D and F.  By signing the seal design drawings, Omni represented that the "seal dimension, sign and material are satisfactory." Ex. D.  After approving the drawing, Omni tested the seals for fit and installation by installing samples and performing pressure tests.  Ex. E, Kemper Dep., pp. 36–37.

With supporting evidence, Parker reiterates, *inter alia*, that

Omni began issuing purchase orders in September 2004 and accepted delivery of seals from Parker (Ex. G) for the next year without disputing the "TERMS AND CONDITONS" in the two quotations. Matthews and Kemper, Omni's designated corporate representatives, stated in depositions that it was Omni's responsibility to install the seals correctly.  Ex. H at pp. 105-12; Ex. E at pp. 28-29. Each gearbox was supposed to be tested before leaving Omni's manufacturing sites.  Ex. E at p. 33 and Ex. 2; Ex. H, pp. 75-76 and Ex. 2.

In February 2007 Omni requested more seals from Parker.  Ex. J, invoice).  Because Omni was not receiving enough seals quickly, Omni purchased seals from other vendors and used them in the gearboxes.  In the fall of 2007, T&L complained about leaks in some of the gearboxes shipped to it by Omni in 2005.  Ex. E, pp. 31-33 & Ex. 9; Ex. H at pp. 116-20 and Ex. 9.  Parker highlights the fact that all of the purportedly leaking seals were discarded, and Omni and T&L cannot determine which of the numerous gearboxes sold leaked.  Ex. I, T&L engineering manager Douglas Soderquist's Dep. at pp. 143-45.  There is no record of how many seals allegedly leaked or whether any of the allegedly leaking seals were from Parker or from other vendors.  The limited testing that was done was unable to duplicate leaking or determine its cause.  Daniel Dep. at pp. 207-14, 262; Ex. H, Matthews Dep. at pp. 122-24. Parker complains that Omni filed this suit despite the fact that

there was no evidence of a defect in the Parker seals; all
allegedly leaking seals were discarded; no root cause analysis was
performed; there was no evidence regarding which gearboxes leaked;
there was no evidence whether the seals in the allegedly leaking
gearboxes were from Parker or another vendor; and the "TERMS AND
CONDITONS" disclaim implied warranties and limit liability.

One Term and Condition was an express warranty that the seals
would be free from defects in materials and workmanship for one
year from the date of delivery.  Omni's failure to give notice of
any claim within a year of delivery of the seals and its failure to
identify a defect in material and workmanship that existed at the
time of delivery require the Court to dismiss Omni's claim for
breach of express warranty.  Another term and condition explicitly
disclaimed implied warranties of merchantability and fitness for a
particular purpose and any warranty for service life.  The warranty
exclusions were conspicuous, and Omni was aware of them and given
every opportunity to inspect the seals.

If Omni's claims are not dismissed for other reasons, Parker's
"TERMS AND CONDITONS" also limit Parker's liability either to
repairing or resupplying any allegedly defective seals.  The
written "TERMS AND CONDITONS" include an express warranty that the
seals would be free from defects in materials and workmanship for
a period of only one year from the date of delivery and not
afterward, thus barring claims in 2007 and afterward about the

seals sent by Parker to Omni in 2005.

Moreover "TERMS AND CONDITONS" warranted only that the Parker component part, the seals, would be free of defects in material and workmanship for one year, not the finished-product gearboxes, and Omni has not shown the leaking was caused by a defect in the component part. In writing Parker specifically disclaimed or excluded all implied warranties, including those for merchantability and for a particular purpose, as well as any warranty for service life. Moreover under section 2.316(c)(2), where "the buyer before entering into the contract has examined the goods of the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Even if the warranty is inconspicuous, which is not the case here, where the first page called attention to the "TERMS AND CONDITONS" in capital letters and the "TERMS AND CONDITONS" are in all capital letters, as are the warranty limitations, the disclaimer is valid if the buyer has actual knowledge of the disclaimer. *Cate v. Dover Corp.*, 790 S.W. 2d at 561. The "TERMS AND CONDITONS" were faxed to Daniel, Omni's President (Ex. B). Furthermore Daniel testified that his education and experience in the industry made him well aware of standard terms and conditions such as, and including, those in Omni's quotations. Daniel Dep., Ex. A, pp. 78-90, 96-97, 101-02.

Matthews also testified that he was familiar with the standard terms and disclaimers of implied warranties from his education and experience and he was aware of the limited warranties and remedies associated with the seals.  Ex. H, pp. 34-35, 49-51, 126.  Kemper testified that Omni's customers were expected to abide by Omni's limitations in its warranties.  Ex. E at pp. 27-28.  Omni had every opportunity to inspect the seals, test them, and be sure they were working properly under section 2.316.

Furthermore, insists Parker, Parker expressly excluded all labor and service charges, as well as damages other than for repair or resupply of any defective seal under the "TERMS AND CONDITONS". Since Omni did not preserve the seals that allegedly leaked nor keep a record of which ones did, or which gearboxes leaked, or which gearboxes contained Parker seals or seals from other vendors, there is no evidence to support Omni's claimed damages.  Omni has not designated an expert on damages, and Parker's expert stated that Omni's damage allegations are speculative.  The measure of direct damages for a breach of warranty is the market value difference between the goods as delivered and the goods as warranted at the time and place of acceptance unless special circumstances show proximate damages of a different amount.  Tex. Bus. & Com. Code Ann. § 2.714(b); *Chaq Oil Co. v. Gardner Machinery Corp.*, 500 S.W. 2d 877, 878-79 (Tex. Civ. App.--Houston [14th Dist.] 1973, no writ)("[T]he measure of damages for either an express or

an implied warranty is the difference in market value between the equipment as delivered and as warranted.").

Omni was required by the "TERMS AND CONDITONS" to notify Parker of any claim in writing within thirty days from the date the defect is discovered or should have been discovered.  Ex. B.  Omni failed to notify Parker within thirty days, as well as within the one year from date of delivery as required by the express warranty. Furthermore the statute of limitations for a breach of warranty is four years.  Tex. Bus. & Com. Code Ann. § 2.725(a)("An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued.  By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it."); *American Tobacco v. Grinnell*, 951 S.W. 2d 420, 435 (Tex. 1997).  A cause of action for breach of warranty accrues when the goods are tendered for delivery, even if the aggrieved party did not know of the breach and even if they are defective.  *Id.* at § 2.725(b)("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."); *Conquest Drilling Fluids, Inc. v. Tri-Flo Int'l*, 137 S.W. 3d 299,

302 (Tex. App.--Beaumont 2004, no pet.).   Since Omni filed this
action on October 13, 2010, argues Parker, the statute of
limitations bars any cause of action that accrued before October
13, 2006; because the evidence shows that the leaking gearboxes
were delivered in 2005, Omni's claims should be dismissed with
prejudice.

**A.   Omni's Response (#46)**

Although Parker asserts, "Omni was in the unique position to
determine whether the seals were properly installed and whether
they would leak prior to shipping its gearboxes to its customers,"
Omni argues that it was not the seal expert here, Parker was, and
yet Parker sold Omni defective seals.   Omni states that it did
perform its standard, rudimentary pressure checks before selling
its gearboxes with Parker's seals.   Ex. A, Matthews Dep.   Omni
maintains that Parker breached its contract by failing to provide
Omni with adequate replacement seals once the original ones proved
to be defective.

Omni insists that its expert's reports evidence that Parker's
seals were defective or defectively designed.   Ex. E, Seal rotation
test and report, p.9, to #33 ("Based on the testing completed, it
is clear that [Parker's] seals are designed with too much internal
friction and torque to the point that many of them do not operate
correctly.   In addition, rubber coating on this particular seal
design is such that it makes them very difficult if not impossible

to consistently install correctly.  Therefor, it is my opinion that [Defendant's] seals are experiencing premature failure from either improper operation of the seal itself, or from the misalignment problems inherent to this design.").

As for Omni's breach of contract claim, Omni maintains that Parker does not dispute that it breached its agreement with Plaintiff to provide replacement seals for the defective seals. Omni claims that at trial it will prove that Defendant breached its agreement to provide adequate seals by attempting to change the original terms and offering replacement seals of unknown quality at higher prices with a stipulation to purchase certain quantities from Parker.  Meanwhile to counter the argument that there is a distinction between breach of contract and breach of warranty claims, Omni questions the premise, insists Parker breached the contract to provide replacement seals, and "to the extent there is no such steadfast rule as Defendant alleges, Plaintiff continues to assert its breach of contract claim that Defendant failed to provide Plaintiff with non-defective seals."  #46 at p. 8.

Omni further argues that the additional terms were not conspicuous, were not agreed to by it, and did not become part of the agreement between the parties.  Omni claims it did not become aware of the terms until its attorney discovered them when examining the invoice copies after litigation began.  In its

Opinion and Order of June 28, 2011 (#15 at pp. 29–30)[26] this Court wrote, "Neither party indicates how many invoices were sent to Omni and how many of those contained the Standard Terms; clearly it was not a consistent part of the course of dealings between the two. Moreover whether Parker can establish that the few invoices containing it constitute a 'confirmation' of the whole agreement under what is known as the 'merchant's exception' of Tex. Bus. & Com. Code § 2.207(c) remains a question."

Regarding Omni's claim for damages, Omni states that it sent Parker a chart of minimum damages incurred as a result of the demand from customer T&L.   Ex. C, Recall Damages Chart. Soderquist, T&L's former president, testified that under the circumstances, a total recall was the most economical and efficient method of replacing the defective seals.  Ex. D, Soderquist's Dep. at pp. 87–89.  Moreover Omni presents a measure of damages for its breach of express warranty as the difference between the goods as delivered and as warranted, which at minimum should have been full replacement value since when delivered the value of the goods was nonexistence because the seals were not in working condition.   It further asserts that the value could be negative because utilizing

---

[26] Opinion and Order (#15) addressed the original complaint and granted a motion for more definite statement.  The quoted portion dealt with Omni's breach of contract claim, which the Court has indicated in the instant Opinion and Order must be dismissed since the goods were delivered and accepted, relegating Omni to its breach of warranties causes of action.   Omni filed its First Amended Complaint (#16) on July 13, 2011.

defective seals was more costly than their worth, which was zero.

## B.  Parker's Reply (#49)

Parker reiterates that it is uncontroverted that (1) Omni has not identified a defect in the Parker seals, (2) Parker's "TERMS AND CONDITIONS" were separately communicated to and accepted by Omni to limit Parker's liability and damages in this case, (3) Omni was aware of the "TERMS AND CONDITIONS" and had every opportunity to inspect the seals, (4) Omni had exclusive control of the design of the gearboxes into which the seals were placed and exclusive control over the manufacturing method used to place the seals into the Omni gearboxes, and (5) after placing the seals in the gearboxes, Omni had exclusive control over the quality control inspections made to confirm that the installation was proper.[27] Moreover there is uncontroverted evidence that Omni approved the seal design, that the seals could be properly installed, and that the gearboxes with the Parker seals were used for years before there were any complaints from customer T&L, well past the one-year express warranty provided by Parker that the seals would be free from defects in material and workmanship.  Thus Parker is entitled

---

[27] During his second deposition, Bell testified that the manufacturer/assembler of the end product was responsible for manufacturing techniques to assemble all the components to function properly, for determining that the seals, as a component, fit the application, that a quality control system was in place to make sure they worked, for determining whether there were any problems with the seals and if so, to notify the seal manufacturer of any seal installation issues, and to preserve the evidence.  #62, Ex. A at pp. 100-01, 114-15, 123-28.

to judgment was a matter of law.

Parker again objects to the deposition excerpts attached by Omni to its response (Exs. A and C) because there is no title page or other evidence showing who the witness is or that the witness was sworn. *Refrigeracion*, 1998 WL 1782541 at *1 ("Excerpts from depositions are not competent summary judgment evidence unless the party offering them attaches a copy of the court reporter's certificate certifying that the copy is true and correct."). Nor is Omni's "Recall Damages Chart" (Ex. B to #46) authenticated.

## VI. Court's Determination on Motions for Partial Summary Judgment

As a threshold matter, the Court has pointed out that as a matter of law, breach of contract and breach of warranty are distinct and different claims with different remedies, and "[w]hen a party fails to deliver the goods as promised, a breach of contract occurs[,] but when a seller delivers nonconforming goods, it is a breach of warranty." *Structural Metals, Inc. v. S&C Elec. Co.*, 2012 WL 930816, *3, *citing Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W. 2d at 890; *in accord, Ellis v. Precision Engine Rebuilders, Inc.*, 68 S.W. 3d at 897; *Head v. U.S. Inspect DFW, Inc.*, 199 S.W. 3d 731, 746 (Tex. App.--Fort Worth 2005). *See generally Southwestern Bell Telephone Co. v. FDP Corp.*, 811 S.W. 2d at 576.[28] Because Parker did not fail to deliver the goods, and

---

[28] The Texas Supreme Court in *Medical City Dallas, Ltd.* v. Carlisle Corp., 251 S.W. 3d 55, 60-61 (Tex. 2008), reiterated that "breach of warranty and breach of contract are distinct causes of

because Omni accepted them, the Court concludes that as a matter of law Omni has no claim for breach of contract, but only claims for breach of express and implied warranties.

Second, Parker's first motion for partial summary judgment argues that Omni must prove there is a defect in Parker's seals to prevail on all its breach of warranty claims.  Contrary to Parker's claim, the Texas Supreme Court, although holding that "proof of a defect is required in an action for breach of implied warranty of merchantability under section 2.314(b)(3)," clearly opined, "In an action based on implied warranty of fitness for a particular purpose, proof of a defect is not required."  *Plas-Tex*, 772 S.W. 2d at 442 n.2, *citing* 1 J. White & R. Summers, *Uniform Commercial Code* § 9-10. at 482 and n.3 (3d ed. 1988).  Thus Parker's motion for partial summary judgment on Omni's claims for implied warranty of fitness for a particular purpose on the grounds that it failed to establish a defect in Parker's seals must be denied.

As for Omni's breach of express warranty claim, the term "defect" in the sense of a flaw or a weakness is too broad to describe accurately the element of that cause of action.  Instead

---

action with separate remedies," but noted that "while an express warranty is a distinct claim, it is nonetheless a part of the basis of a bargain and contractual in nature" and "is the result of a negotiated exchange."  In both causes of action the plaintiff is "seeking damages based on an opponent's failure to uphold its end of the bargain."  *Id.*  Therefore a court should apply the "well-established rules for interpretation and construction of contracts" to determine the parties' intentions in a warranty.  *Id.*

§ 2.313(a)(1) requires Omni to show that Parker made an express affirmation of fact or promise relating to the seals, on which Omni relied and which became the basis of the parties' bargain, but which Parker's failure to meet constituted the breach, or in Parker's contention, the "defect." In other words, it failed to conform to express or implied warranties. While Omni's amended complaint asserts that Lovett verbally represented to Omni that Parker was fully capable of designing and manufacturing high quality cartridge seals for Omni's gearboxes, Omni has not provided evidence supporting that allegation. Omni President Jeff Daniel testified during his deposition that Parker warranted that its seals would be free from defects in material and workmanship (#33, Ex. B, p. 116), a statement in essence embodying the implied warranties of merchantability and fitness for a particular purpose. Parker points to the "TERMS AND CONDITONS" on its quotation dated May 21, 2004 (#36, Exs. B & C) as express warranties, accepted by Omni when it signed the drawings and placed orders: "6. Warranty," is *inter alia* "FREE FROM DEFECTS IN MATERIALS AND WORKMANSHIP." The "TERMS AND CONDITONS", however, are not only express warranties, but also material limitations on and disclaimers of the extent of Parker's warranties. Thus the issue becomes whether they are sufficiently conspicuous to be enforceable against Omni, the buyer, under § 2.316. The decision is a question of law for the Court to decide by applying the definition under Tex. Bus. & Com. Code Ann. §

1.201(b)(10).  *Plas-Tex*, 772 S.W. 2d at 444; *Cate v. Dover Corp.*, 790 S.W. 2d at 560.  Section 1.201(b)(10) provides,

> "Conspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. . . . . Conspicuous terms include the following:
>
> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size by symbols or other marks that call attention to the language.

Comment 10 to the section sets out a subjective standard, "the test is whether attention can reasonably be expected to be called to it."

The Court observes that on the front page of the May 21, 2004 written quotation, just after the first sentence that states, "This quotation is made subject to placement and of your order(s) by 60 days [*sic*]," in enlarged capital letters that clearly set it off from the remainder of the text is the sentence, "WE INVITE YOUR ATTENTION TO THE TERMS AND CONDITIONS OF SALE WHICH APPEAR ON THE REVERSE SIDE OF THIS QUOTATION AND WHICH ARE A PART OF THIS QUOTATION."  Ex. B to #36, and C (reverse side)[29].  The Court finds that this sentence is sufficiently conspicuous that a reasonable

---

[29] Parker states that Ex. C is the best copy of the quotation's "TERMS AND CONDITONS" that the parties have, but the wording has been reduced through the copying process.  Ex. B is more legible and closer to the original size of the document.

party should have noticed it and read the reverse side.    Moreover
in *Cate v. Dover Corp.*, 790 S.W. 2d at 561, the Texas Supreme Court
examined a number of cases that held that where a disclaimer is
placed under a heading like "WARRANTY and AGREEMENT" or "Terms of
Warranty," even when the headings were in bold, the disclaimer was
found not to be conspicuous because the title did not suggest
exclusion or modification of a warranty.[30]    Here, "TERMS AND
CONDITIONS" does not suggest the usual warranties are in place, but,
highlighted by the capitalized sentence on the front of the first
page, that the "TERMS AND CONDITONS" of the agreement need attention
and the key disclaimers are visually effectively set off by
capitalization.   Moreover both Parker and Omni are sophisticated
entities with experience in the business of irrigations systems and
who would have understood the legal significance of legal terms
relating to warranties in the documents.

As indicated *supra*, on the reverse side, under the title "TERMS
AND CONDITIONS" in capitals and bold print, are included the
following paragraphs, with the letters rendered as they are in the
document:

---

[30] The Texas Supreme Court does state that alternatively an
inconspicuous disclaimer can be given effect if the seller can show
that purchaser had actual knowledge of it at the time of the
purchase, such as from prior dealings with the seller by the
seller's pointing out the inconspicuous waiver to the buyer, orally
or in writing.   790 S.W. 2d at 561-62.    Moreover an implied
warranty may be excluded by mean other than a conspicuous writing,
e.g., course of dealing course of performance, or course of trade.
These methods do not apply to the facts here.   *Id*. at 562.

6. Warranty.  All shipments of the product sold hereby are subject to the following warranty:  THE SELLER WARRANTS FOR A PERIOD OF ONE YEAR FROM THE DATE OF DELIVERY THAT THE PRODUCT IS FREE FROM DEFECTS IN MATERIALS AND WORKMANSHIP.  THIS LIMITED WARRANTY IS YOUR EXCLUSIVE WARRANTY FROM THE SELLER AND DESCRIBES THE EXCLUSIVE REMEDY AVAILABLE TO ANY PURCHASER OF THE PRODUCT.  THE PRODUCT IS NOT SOLD WITH ANY IMPLIED WARRANTIES.  NOR ANY WARRANTY OF MERCHANTABILITY AND/OR OTHER WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.  IN THE SALE OF THE PRODUCT SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND OTHER THAN THAT STATED HEREIN AND NO PERSON IS AUTHORIZED TO ALTER THIS WARRANTY ORALLY.

7. Limitations of Liability.  It is expressly understood and agreed that the limit of Seller's liability shall be, at Seller's sole option, repair or resupply of the product. Resupply shall mean furnishing free of charge (F.O.B. place of original purchase) a new shipment of the product (uninstalled) in an amount sufficient to replace any product found to be defective.  All labor and service charges which may be incurred with respect to either the original or replacement product are excluded.  THE SELLER SHALL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES SUCH AS DAMAGE TO ANY BUILDING STRUCTURES TO WHICH THE PRODUCT IS AFFIXED OR ITS CONTENTS; NOR SHALL THE SELLER BE LIABLE FOR ANY DAMAGES WHICH ARE BASED UPON ALLEGED NEGLIGENCE, BREACH OF WARRANTY, STRICT LIABILITY OR ANY OTHER THEORY OTHER THAN THE LIMITED LIABILITY SET FORTH ABOVE.  INCIDENTAL AND CONSEQUENTIAL DAMAGES SHALL NOT BE RECOVERABLE EVEN IF THE RESUPPLY FAILS OF ITS PURPOSE OR FOR ANY OTHER REASON.

8.  Any claim on account of damaged products, warranty, short count or for any other cause shall be deemed waived unless made in writing within 30 days from the date the defect or cause to which each claim relates is discovered or should have been discovered.

#36, Ex. B and C.

Paragraphs 6 and 7 are the only paragraphs under the "TERMS AND CONDITONS" that contain substantial passages conspicuously set off in all capital letters, and those passages highlight the key disclaimers and limitations on the warranties. *See, e.g., Rmax,*

*Inc. v. Sarnafil, Inc.*, No. Civ. A. 3:03-CV-1404-B, 2004 WL 2070967, *1 (N.D. Tex. Sept. 16, 2004). Implied warranties must be expressly disclaimed, in writing, and must be conspicuous. §§ 2.314, 2.315. A disclaim er implied warranty of merchantability must be conspicuous and use the word "merchantability." § 2.316(b). These requirements have been met here and the disclaimers and limitations are enforceable. Because they are enforceable, the one-year time limitations on the express warranty that the seals were free from defects in materials and workmanship and the clear disclaimer of any implied warranties bar Omni's claims. Nor did Omni comply with paragraph 8, requiring written notice of any damaged product or warranty "within 30 days from the date the defect or cause to which each claim relates is discovered or should have been discovered.

Third, regarding Parker's insistence that Omni failed to show a defect in Parker's seals and Parker's challenges to Omni's unauthenticated evidence, Federal Rule of Civil Procedure 56(c)(2) provides, "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Allegations of the nonmovant must be supported by admissible evidence to defeat a motion for summary judgment. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 192 (5th Cir. 1990). "Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial . .

. ." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 787, 793 (5th Cir. 1991), *quoting Geiserman v. McDonald*, 893 F.2d 787, 793 (5th Cir. 1990)(*quoting* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2727 at 156 (1983). *See also Watts v. Kroger Co.*, 107 F.3d 505, 508 (5th Cir. 1999)("A plaintiff must respond to an adequate motion for summary judgment with admissible evidence."). The Advisory Committee's comment to Rule 56(c) in the 2010 Amendments states, "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." "[T]he admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to a trial." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004). Federal Rule of Civil Procedure 30(f)(1) requires that for a deposition transcript, the court reporter "must certify in writing that the witness was duly sworn and that the deposition is a true record of the testimony given by the witness." *Coach, Inc. v. D 4 L Apparel*, No. SA-11-CV-00185-DAE, 2013 WL 489658, *6 (W.D. Tex. Feb. 7, 2013)(sustaining the objection that depositions were not certified by the court reporter). Rule 901 provides, "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the evidence in question is what its proponent claims it to be." Opining that there need not be conclusive proof of authenticity before the Court admits disputed evidence, the Fifth

Circuit has opined, that "'Rule 901 does not limit the type of evidence allowed to authenticate a document.  It merely requires some evidence which is sufficient to support a finding that the evidence in question is what the proponent claims it to be.'"  *U.S. v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993)(*quoting U.S. v. Jimenez-Lopez*, 873 F.2d 769, 772 (5th Cir. 1989)), cited by *Tremont LLC v. Halliburton Energy Services, Inc.*, 696 F. Supp. 2d 741, 753 n.8 (S.D. Tex. 2010).  An authenticating affidavit will often serve this purpose.  Here the format of the excerpts suggests that they are what Omni claims them to be, but Omni has not responded to Parker's challenge to identify and authenticate the deposition excerpts on which it relies.  At the same time, Parker does not claim that the excerpts are not true and correct copies of parts of the deposition that Omni claims they are, nor has it challenged Bell's qualifications to be an expert witness.

The Court finds that under the circumstances here the bottom line is whether these deposition excerpts substantively constitute relevant and reliable expert testimony.  The Court, in its role as a gatekeeper, has broad discretion in determining whether such testimony is relevant and reliable and should be admitted.  *Wilson v. Woods*, 163 F.3d 935. 937 (5th Cir. 1999), *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-93 (1993).  Federal Rule of Evidence 702 allows a witness "qualified as an expert by knowledge, skill, experience, training or education" to

offer opinion testimony if that testimony will assist the trier of fact, if "the testimony is based on sufficient facts or data," if it "is the product or reliable principles and methods," and if "the expert has reliably applied the principles and methods of the facts of the case." The Court also has broad discretion to determine if the evidence relied upon by an expert is reliable and sufficient to support and make admissible the expert's opinion. *Johnson v. Arkema, Inc.*, 685 F.3d 452, 458-59 (5th Cir. 2012), *citing Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007).

The key factor regarding Bell's testimony, as discussed *supra*, is that the transcript of Bell's second, court-ordered deposition testimony was submitted and properly authenticated by Parker. This second deposition testimony undermines Bell's earlier expert opinion testimony during Bell's first deposition that Parker's seals were defective by now revealing that when he performed his tests, he was materially misled about the age of the two groups of seals that he tested and that therefore his conclusions are invalid.[31] Nor was he

---

[31] As discussed, Bell admitted that because he had not been told about the age of Parker's or the comparison seals, (1) his first test and report, aimed at proving Parker seals were inferior to other designs, did not contain valid conclusions and that he could not state that Parker seals were inferior; (2) he has no opinion of how Parker seals performed when new (and when they were delivered to Omni by Parker) because he only tested six-to-seven-year-old ones, had no opinion about other causes of difficult installation because he was not asked by Omni to investigate Omni's inspection practices, installation techniques, consistency of gearbox dimensions, manufacturing practices, worker training, or quality control, and admitted that difficult installation of a seal into a company's gearbox is not proof of a defect in the seal; and

aware before starting his experiment that the seal was cocked.  #62, Ex. A at 26.  Even if the leakage was because of seals' not being installed by Omni flush with their endcaps, he conceded that there where a number of possible causes why they were not flush and he was not asked to rule any out.  *Id.* at p. 97-123.  Thus by Bell's own admission his conclusions based on his comparison of gearboxes, one with Parker's six- or seven-year-old seals and another vendor's new seals, were not helpful to the Court or a jury in this case, but irrelevant and unreliable bases to determine the condition and measure the function of the seals at the time Parker sold and delivered them to Omni in 2005.  Bell was not given enough data to determine why the T&L gearboxes were leaking.  #62, Ex. A at 80-82. Bell disclaimed the informational value of the three EPS reports. *Id.* at 146.  Moreover Bell also admittedly failed to rule out other possible causes of the leakage.  *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W. 2d 549, 558-59 (Tex. 1995)("An expert who

---

(3) regarding the third test and report, performed to see if the Parker seals would rotate, again he had no opinion as to how the Parker seals behaved when new because he only tested old ones. Bell further testified that, as the manufacturer of the end product, Omni had the responsibility to determine that the seals fit into the gear box and worked, that all the component parts were proper for the end product, and that Omni's alleged difficulty in installing a seal into a gearbox did not indicate there was a defect in the seal's design.  He also admitted that he was not given the information necessary to find out why the Omni gearboxes sent to T&L were leaking, whether there was a flaw in the endcaps of the gearboxes, whether the manner of assembly or manufacture was faulty, or whether there was a problem with the quality control of the gearboxes, all within Omni's control.

is trying to find a cause of something should carefully consider alternative causes"; concluding that the trial court did not abuse its discretion when it excluded testimony by an expert who "conducted no testing to exclude other possible causes"), *citing In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758-59 (3d Cir. Aug. 31, 1994); *Transcontinental Ins. C. v. Crump*, 330 S.W. 3d 211, 217-18 (Tex. App.--Austin 2010); *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000)(*citing In re Paoli*), *cert. denied*, 531 U.S. 926 (2000).   Therefore the Court concludes that Bell's testimony was insufficient to support those of his conclusions on which Omni relied and it must be excluded.

Omni fails to identify and support with admissible evidence a defect or deficiency or shortcoming in the Parker seals that caused the leakage, an essential element for Omni's claims for breach of express warranty and breach of implied warranty of merchantability. "Texas law does not generally recognize a product failure standing alone as proof of a product defect." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W. 3d 797, 807 (Tex. 2006).   A plaintiff may show a defect in an implied warranty of merchantability case by means of circumstantial evidence by establishing that there was a malfunction together with evidence of proper use of the goods.   *Plas-Tex*, 772 S.W. 2d at 444-45.   There has been no evidence of T&L's use, proper or improper, produced by the parties.   "A conclusory statement of an expert witness is insufficient to create a question of fact to

defeat summary judgment." *McIntyre v. Ramirez*, 109 S.W. 3d 741,749 (Tex. 2003). Moreover, § 2.314(b) requires for a breach of implied warranty of merchantability that the goods must be defective, i.e., "unfit for ordinary purposes for which they are used because of a lack of something necessary for adequacy," **at the time they left the manufacturer's or seller's possession**. *GMC v. Brewer*, 966 S.W. 2d 56, 57 (Tex. 1998), *quoting Plas-Tex*, 772 S.W. 2d at 443-44.  Omni has failed to produce admissible evidence that shows the condition of the gearboxes at the crucial time.

Moreover, as should be evident from this discussion, the Court agrees with Parker's arguments in its second motion for partial summary judgment.

**VII.  Parker's Motion for Partial Summary Judgment Against Omni on Parker's Counterclaims[32] for Unpaid Invoices (#37)**

Parker's counterclaims assert that Omni is liable for $15,233.00 for seals which Omni ordered and received, but refused to pay, and complains that it was left with additional seals manufactured in accordance with the design requested and approved by Omni, 910 in breach of contract under Texas or Ohio law, (2) an action on an account under Ohio law, and (3) a suit on a sworn account under Texas law.  Alternatively, Parker sues Omni for unjust enrichment and quantum meruit under Texas or Ohio law.  Parker asks

---

[32] Parker's Answer to Omni's First Amended Complaint and Counterclaims is instrument #22.

for damages, prejudgment and post-judgment interest and reasonable and necessary attorneys' fees, expenses and costs.  By the time Parker filed its motion for partial summary judgment (#37), it apparently abandoned its Ohio law claims and sues for these causes of action solely under Texas law.

Parker attaches to Paul Yager's declaration (Exhibit A) a copy of his prior affidavit that was attached to Parker's original answer (#37, Ex. A) attesting to Omni's unpaid $15,233.00 for seals it received from Parker, and copies of two unpaid invoices.  The declaration states,

> The prices Omni charged were just and true because they were according to the terms of a contract.  They were also usual and customary and reasonable prices.  A systematic record of the transactions were kept, and a complete accounting of the amounts due and owing by Omni USA, Inc. to Parker-Hannifin Corporation is attached to my prior affidavit attached to Parker's Counterclaims as Exhibit A, and is incorporated by reference as if fully set forth herein.  All lawful offsets, payments, and credits have been applied to the account.  The account remains unpaid.

The declaration is sworn under penalty of perjury. Parker also provides a declaration from attorney Jeremy R. Stone in support of a request for attorneys' fees for himself, co-counsel Louis M. Scofield, Jr., and their law firm, Mehaffy Webber, in the amount of $110,101.50, with supporting resumes of the two attorneys. Alternatively, Parker contends that Omni is liable under equitable theories of unjust enrichment and quantum meruit under Texas law.

Omni has not filed a substantive response to this motion.

**Relevant Law**

*Sworn Account*

"The elements of an action on account [under Texas common law] are (1) there was a sale and delivery of merchandise, (2) that the amount of the account is just, that is, that the prices are charged in accordance with an agreement or in the absence of an agreement, they are usual, customary and reasonable prices for that merchandise; and (3) that the amount is unpaid." *ABB, Inc. v. Pena*, Civ. A. No. L-10-83, 2011 WL 906651 (S.D. Tex. Mar. 5, 2011), *citing Pro Connectors, Inc. v. Parker Hannifin Corp.*, 889 S.W. 2d 555, 558 (Tex. App.--Houston [14th Cir.] 1994, no writ), and *Pat Womack, Inc. v. Weslaco Aviation, Inc.*, 688 S.W. 2d 639, 641 (Tex. App.--Corpus Christi 1985, no writ).  If a party prevails on a suit on a sworn account, it is entitled to attorney's fees under Texas Civil Practices and Remedies Code § 38.001(7).  *Id.* at *2.  "State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448, 462 (5th Cir. 2002).

Texas Rule of Civil Procedure 185, "Suit on Account," establishes a means of making a *prima facie* claim for a suit on account:

> When any action or defense is founded upon an open account or other claim for goods, wares and merchandise, including any claim for a liquidated money demand based upon written contract or founded on business dealings between the parties, or is for personal service rendered, or labor done or labor or materials furnished, on which

a systematic record has been kept, and is supported by
the affidavit of the party, his agent or attorney taken
before some officer authorized to administer oaths, to
the effect that such claim is, within the knowledge of
affiant, just and true, that it is due, and that all just
and lawful offsets, payments and credits have been
allowed, the same shall be taken as prima facie evidence
thereof, unless the party resisting such claim shall file
a written denial, under oath.  A party resisting such
sworn claim shall comply with the rules of pleading as
are required in any other kind of suit, provided,
however, that if he does not timely file a written denial
under oath, he shall not be permitted to deny the claim,
or any other item therein, as the case may be.  No
particularization or description of the nature of the
component parts of the account or claim is necessary
unless the trial court sustains special exceptions to the
pleadings.

Parker's motion follows the prescription of Rule 185.  With
respect to the evidence necessary to make a *prima facie* case,
however, the Texas Supreme Court has held that Rule 185 is a
procedural rule, not a rule of substantive law.  *Sneed Shipbuilding,
Inc. v. Spanier Marine Corp.*, 125 F.R.D. 438, 443-44 (E.D. Tex.
1979), *citing Rizk v. Financial Guardian Ins. Agency, Inc.*, 584 S.W.
2d 860, 862 (Tex. 1979).  *See also e.g., Steelplan Ltd. v. Steel
Plan Australia Pty., Ltd.*, No. 3:02-CV-0470-P, 2003 WL 21499303, *8
(N.D. Tex. June 25, 2003)("Rule 185 does not create a substantive
cause of action. Rather, the rule is strictly procedural--it
"facilitate[s] the presentation of evidence by providing that,
absent verified denial, the pleadings, if they conform to the rule
and are pleadings of facts rather than mere conclusions, constitute
prima facie evidence of the justness of the claim, avoiding the
necessity of further proof.'"), *citing Hou-Tex Printers v. Marbach,*

-65-

862 S.W. 2d 188, 190 (Tex. App.--Houston [14th Dist.] 1993), and
*Achimon v. J.I. Case Credit Corp.*, 715 S.W. 2d 73, 76 (Tex. App.--
Dallas 1986 (Stephens, J,., concurring).

    In a diversity jurisdiction case, such as the instant action,
federal courts apply state substantive law, but federal procedural
law, and thus Rule 185 is not binding on federal courts. *Steelplan*,
2003 WL 21499303, at *9; *Steves & Sons, Inc. v. Trinity Glass Int'l,
Inc.*, Civ. A. No. SA-06-CV-357-XR, 2007 WL 1556743, *4 (W.D. Tex.
May 25, 2007), *citing Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d
391, 395 (5th Cir. 2003)("'Federal courts apply state substantive
law when adjudicating diversity-jurisdiction claims, but in doing
so apply federal procedural law to the proceedings.'"); *ABB, Inc.*,
2011 WL 906651 at *3. *See also Sneed Shipbuilding, Inc.*, 125 F.R.D.
438 (holding that Fed. R. of Civ. P. 11 interpreting attorney's or
party's signature to be certification that the pleading is grounded
in law or fact or on colorable argument for changing law, displaced
Tex. R. of Civ. P. 185 requiring verified denial in defendant's
answer to challenge accuracy of plaintiff's accounting). Thus the
standard of Federal Rule of Civil Procedure 56 applies to determine
if Parker has established the elements of its claim of suit on sworn
account. *ABB, Inc.*, 2011 WL 906651 at *2.

    Here besides the invoices and a conclusory affidavit from
counsel, Parker has not provided summary judgment evidence that the
amount of the account is just, i.e., that the prices are in accord

with an agreement or, in the absence of an agreement, are the usual
customary and reasonable prices for the seals.   Thus it fails to
meet is burden of proof and its motion for partial summary judgment
on its counterclaim for sworn account will be denied.

*Breach of Contract*

    Texas Courts apply the UCC to contracts for the sale of goods
even if the parties characterize the claim as a common law breach
of contract or breach of warranty case.   *Courey Int'l v. Designer
Floors of Texas, Inc.*, No. 03-09-00059-CV, 2010 WL 143420, *3 (Tex.
App.--Austin Jan. 15, 2010, no writ), *citing Tex. Bus. & Com. Code
Ann.* § 2.102; *SelecTouch Corp. v. Perfect Starch, Inc.*, 111 S.W. 3d
830, 834 (Tex. App.--Dallas 2003, no pet.)("Contracts relating to
the sale of goods are governed by article two of the [UCC}, adopted
in Texas as chapter two of the business and commerce code."), and
*Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48
S.W. 3d 225, 236 (Tex. App.--San Antonio 2001, pet. denied)("the UCC
applies to contract for sale of goods even when the parties 'treat[]
th[e] case as a common law breach of contract and breach of warranty
case'").   Texas courts have regularly acknowledged that "'[w]here
the UCC applies, common-law rules of law regarding breach of
contract do not apply.'"   *Id., quoting Aquila Southwest*, 48 S.W. 3d
at 235 (citing § 2.102 and *Glenn Thurman, Inc. v. Moore
Construction, Inc.*, 942 S.W. 2d 768, 771 (Tex. App.--Tyler 1997, no
writ)).   *See also United Galvanizing, Inc. v. Imperial Zinc Corp.*,

-67-

Civ. A. No. H-08-0551, 2011 WL 11185, *9 (S.D. Tex. Jan. 3, 2011)("The UCC supersedes the common law.  To the extent the UCC does not resolve a question, courts generally look to the common law."), *citing* § 1.303(b).

Under Texas law the elements of a breach of contract are "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009).  As discussed *supra*, Parker has provided in the record proof of a valid contract.

A seller may sue for the price of the goods when the buyer failed to pay as that bill became due. *Nazareth Intern., Inc. v. J.C. Penney Co.,* 287 S.W. 3d 452, 458 (Tex. App.--Dallas 2009, rev. denied) and Tex. Bus. & Com. Code Ann. § 2.709(a)("When the buyer fails to pay the price as it becomes due the seller may recover, together with incidental damages under the next section, the price (1) of goods accepted . . . .").

Section 2.606(a) of the Texas Business and Commerce Code provides that acceptance of goods received occurs when the buyer

> (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>
> (2) fails to make an effective rejection (Subsection (a) of Section 2.602), but that such acceptances does not occur until the buyer has a reasonable opportunity to

inspect them; or

(3) does any act inconsistent with the seller's ownership . . . . .

Omni received the seals but failed to object that they were non-conforming or to reject them and notify Parker within a reasonable time, but instead put them to use in its gearboxes.  "'When a buyer puts the goods to use, it is generally held that he has accepted the goods.'"  *United Galvanizing*, 2011 WL 11185 at *11, *citing* 4 Lary Lawrence, *Anderson on the Uniform Commercial Code* §2-606.70 at 272 (3d ed. 2006).  Section 2.703(1) provides, "Where the buyer . . . fails to make a payment on . . . delivery . . . the aggrieved seller may . . .  recover . . . in a proper case the price . . . .").  Moreover Omni's conduct in installing the seals into its gearboxes was inconsistent with the seller's ownership of the goods, amounting to the buyer's acceptance of the goods and triggering the duty to pay the contract price.  *Bacchus Industries, Inc. v. Frontier Mechanical Contractors*, 36 S.W. 3d 579, 585 (Tex. App.--El Paso 2000); *Kuiper v. Wright*, No. 05-99-00689-CV, 2001 WL 923367, *4 (Tex. App.--Dallas Aug. 16, 2001)(as a matter of law, appellees' installation of stone columns is an act inconsistent with Kuiper's ownership of the columns).  *See also* Lawrence, *Anderson on the Uniform Commercial Code* § 2-606:64 "Modification of goods")(3d ed. database updated June 2012)("When the buyer has not rejected the goods and has made a substantial modification to them, the buyer is deemed to have accepted the goods."); *id.* at § 2-607:81 ("A buyer's

conduct in making substantial repairs and modifications to nonconforming goods after delivery was inconsistent with the seller's ownership of the goods.   As a result, the buyer had accepted the goods thereby triggering a duty on the buyer's part to pay the contract price together with attorney's fees authorized under the contract.")(*citing Bacchus Industries*).

Section 2.709(a)(1), "Action for the Price," states in relevant part,

> (a) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price
>
> (1) of goods accepted . . . within a commercially reasonable time after the risk of their loss has passed to the buyer; and
>
> (2) where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are sill in his control except that if resale becomes possible he may resell them at any time prior to the collection of the judgment.   The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold . . . .

*See, e.g., Stanley Industries of South Fla., Inc. v. J.C. Penney Co.*, Civ. A. No. 3:05-CV-2499-L, 2006 WL 2432309. *2 (N.D. Tex. Aug. 18. 2006).   The common law doctrine that one contracting party is automatically excused from his contractual performance by a prior breach of the other party is wholly inapplicable to a contract for the sale of goods governed by the U.C.C." *Glenn Thurman, Inc. v. Moore Constr., Inc.*, 942 S.W. 2d 768, 772 (Tex. App.--Tyler 1997, no writ); *In re Sage Enterprises, Inc,*, 421 B.R. 477, 495 (Bkrtcy.

N.D. Ill. 2009).[33]

Because Omni accepted the goods and put them to use and did not object to their nonconformity until years later, it is obligated to pay to Parker the price it contracted to pay under § 2607(a) and § 2709(a)(1) for those goods whose invoices Omni did not pay.  While Parker is entitled to summary judgment on its breach of contract counterclaim, other than the unpaid invoices it has not provided evidence of any other damages.  Thus Parker has demonstrated that Omni is liable to Parker for $15,233.00.

*Quantum Meruit/Unjust Enrichmant*

A claim for the equitable remedy of *quantum meruit,* which is founded on unjust enrichment, arises independent of a contract when "1) valuable services were rendered or materials furnished; 2) for the person sought to be charged; 3) which services and materials were accepted by the person sought to be charged, used, and enjoyed by him; 4) under such circumstances as reasonably notified the

---

[33] Because a purpose of the UCC was to provide uniform law among various jurisdictions adopting it, and the statutory directive that uniform acts be construed to make uniform the law of those states that enact it in Tex. Gov. Code Ann. § 311.028, decisions from other jurisdictions that have adopted the UCC are persuasive authority. *Western Nat. Bank v. Rives*, 927 S.W. 2d 681, 685 (Tex. App.-Amarillo 1996, writ denied); *Fetter v. Wells Fargo Bank Texas,* 110 S.W. 3d 683, 687 (Tex. App-Houston [14th Dist.] 2003)("we are required to construe uniform acts included in a code 'to effect its general purpose to make uniform the law of those states that have enacted it"), *citing* § 311.028 of the Tex. Gov't Code Ann. and *MBank El Paso, N.A. v. Sanchez*, 836 S.W. 2d 151, 152-53 (Tex. 1992)(citing out-of-state case in construing UCC provision).

person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Vortt Exploration, Inc. v. Chevron U.S.A., Inc.*, 787 S.W. 2d 942, 944 (Tex. 1990); *Green Garden Packaging Co., Inc. v. Schoenmann Produce Co., Inc.*, No. 01-09-00924-CV, 2010 WL 4395448, *6 (Tex. App.--Houston [1st Dist.] Nov. 4, 2010).   A party may recover under *quantum meruit* only when there is no express contract. *Id.*   Because the Court finds that there is an express contract here, Parker may not recover on *quantum meruit*/unjust enrichment.

*Attorney's Fees*

Under Texas Civil Practice & Remedies Code § 38.001(8), "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."  "The award of reasonable attorneys' fees is mandatory under [Texas law] if the plaintiff prevails on his or her breach of contract claim and recovers damages." *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 (5th Cir. 2002).

Attorney's fees under Texas and federal law are determined by the factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 171-19 (5th Cir. 1974) and the lodestar method. *See El Apple I, Ltd. v.* Olivas, 370 S.W. 3d 757 (Tex. 2012); *Campbell v. Hardradio*, No. 3:01-CV-2663-BF, 2003 U.S. Dist. LEXIS 23584, *5 (N.D. Tex. Dec. 31, 2003)(determination of reasonable attorneys'

fees under Texas law is "virtually identical to the *Johnson* factors used by the Fifth Circuit."), *citing Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W. 2d 812, 818 (Tex. 1997); *Vela v. City of Houston*, 276 F.3d 659, 679-81 & n.24 (5th Cir. 2001)("*Johnson* factors are comparable to the *Arthur Andersen* factors); *Lee v. Wells Fargo Bank, N.A.*, Civ. A. No. H-11-1334, 2013 WL 2151680, * 3 & n.1 (S.D. Tex. May 16, 2013).

Parker's counsel has not briefed these factors with sufficient analysis, nor provided billing records or other documentation to support its request and permit the Court to make a meaningful evaluation. Furthermore, Parker prevailed only on its counterclaim for breach of contract under Chapter 2 of the Texas Business & Commerce Code (UCC). To be reasonable and necessary, the fees must be incurred on the claim that allows recovery of such fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W. 2d 1 (Tex. 1991), *modified by Tony Gullo Motors I, LP v. Chapa*, 212 S.W. 3d 299 (Tex. 2006)(exception to the duty to segregate fees where claims are inextricably intertwined). Parker's request for fees must be limited to services and costs relating to the counterclaim for breach of contract on which it succeeded. Moreover one of the factors to be addressed in determining the reasonableness of attorneys' fees is the amount recovered. *Smith v. Patrick W.Y. Tam Trust*, 296 S.W. 3d 545, 548 (Tex. 2009), *citing and quoting Wayland v. City of Arlington*, 711 S.W. 2d 232, 233 (Tex. 1986), and *Arthur*

*Andersen & Co. v. Perry Equip. Corp.*, 945 S.W. 2d 812, 818 (Tex. 1997); *Coffel,* 284 F.3d at 641.  Here Parker has established that it is entitled to recover  $15,233.00, but has requested fees and costs in the amount of $110,101.50, presumably representing the services it has provided for the entire litigation, on its face clearly an amount unreasonable in light of the damages involved. Accordingly, the Court requires Parker to submit within twenty days a new request for fees with appropriate support.  Omni may file a timely response.

**ORDER**

Accordingly, for the reasons stated above, the Court ORDERS the following:

(1) Omni's claim for breach of contract is DISMISSED;

(2) Parker's motion for partial summary judgment (#33) on Omni's claims for breach of implied warranty of fitness for a particular purpose is DENIED, but is GRANTED as to Omni's claims for breach of express warranty and breach of implied warranty of merchantability;

(3) Parker's second motion for partial summary judgment (#36) is GRANTED;

(4) Parker's motion for partial summary judgment (#37) is GRANTED on its counterclaim against Omni for breach of contract, but otherwise DENIED; and

(5) Parker's motion for spoliation instruction (#42) is

MOOT.

Parker shall submit within twenty days a revised request for attorney's fees; Omni shall file a timely response.  At the same time Parker shall also file an updated proposed final judgment.

**SIGNED** at Houston, Texas, this  8th  day of  August , 2013.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE